UNITED INTERCHANGE, INC., OF MASSACHUSETTS
UNIVERSAL INTERCHANGE, INC.
ANTHONY GUARRAIA
AND
OLIVER R. STEVENS
*vs.*
FRANK F. HARDING
ATTORNEY GENERAL FOR THE STATE OF MAINE
AND
HAROLD LABBE
C. HALL BAKER
AND
RALPH B. CHENEY
AS INDIVIDUALS AND AS THE MEMBERS
OF THE
MAINE REAL ESTATE COMMISSION

Cumberland.   Opinion, September 13, 1958.

*Linnell, Perkins, Thompson & Thaxter,* for plaintiffs.

*Roger A. Putnam,* for defendants.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ.

WEBBER, J.    On report.    This was a petition for a declaratory judgment sounding in equity and designed to test the constitutionality of the provisions of R. S., 1954, Chap. 84, as amended by P. L., 1957, Chap. 32, as applied to the business activities of the petitioners.

Prior to the 1957 amendment, Subsec. I of Sec. 2 of Chap. 84 as amended by P. L., 1955, Chap. 299, Sec. 2 read as follows:

> "Sec. 2.    **Definitions and exceptions.**
>
> I.    A 'real estate broker' is any person, firm, partnership, association or corporation who for a compensation or valuable consideration sells or offers for sale, buys or offers to buy, or negotiates. the purchase or sale or exchange of real estate, or who leases or offers to lease, or rents or offers for rent, or lists or offers to list for sale, lease or rent, any real estate or the improvements thereon for others, as a whole or partial vocation."

In 1957 a new class or group to be embraced within the definition of "real estate broker" was added by the following language:

> "A 'real estate broker' shall also include any person, firm, partnership, association or corporation

who engages in the business, for a fee, in connection with any contract whereby he undertakes to promote the sale of real estate through the listing of such property in a publication, issued primarily for such purpose or for referral of information concerning properties to licensed real estate brokers, or both." (P. L., 1957, Chap. 32)

The petitioner, United Interchange, Inc., of Massachusetts, a Massachusetts corporation, is engaged primarily in the business of selling specialized magazine advertising. It has a contractual relationship with petitioner, Universal Interchange, Inc., a California corporation, which publishes among others two publications known respectively as the "Buyers Digest" and the "Brokers Bulletin." The petitioners Guarraia and Stevens are sales representatives for United. The respondents are the Attorney General as the chief enforcement officer for the State and the Maine Real Estate Commission as the licensing and supervisory authority.

The Buyers Digest is a magazine published monthly and containing advertising of business and income producing properties for sale, lease or exchange. It also includes editorial comment and news of the trade. It is sent free of charge to libraries, Chambers of Commerce and the like. The Brokers Bulletin is a pamphlet published at regular intervals at least six times a month. It is in the nature of an advance sheet designed to keep the subscribers informed as to properties currently available. Both publications are distributed without charge to subscribers on a limited and controlled circulation basis. Both depend entirely upon advertising for revenue.

The sales methods of United employ both mail solicitation and personal interviews. In the first instance the owner of a business or income producing property may receive a

solicitation by mail setting forth the nature of the services offered by United and enclosing a reply card on which the potential advertiser may indicate his further interest. Upon receipt of a completed reply card, United sends a salesman to interview the customer. If the salesman is successful, the customer signs a contract to purchase advertising space in the Buyers Digest. The salesman also compiles an advertising data sheet which will guide the composition of the advertisement. The contract is then sent for approval and credit screening to the home office of United. If the contract is accepted, the advertiser is notified by mail. The advertisement is then published in the Brokers Bulletin and in succeeding issues of the Buyers Digest. The customer is entitled to five successive publications of his advertisement unless the property is sooner sold. The contract price is computed upon the amount of space purchased and is in no way contingent upon a sale of the property. United has been doing a substantial and steadily increasing business in Maine.

The activities described obviously fall within the meaning of the statutory language "to promote the sale of real estate through the listing of such property in a publication, issued primarily for such purpose or for referral of information concerning properties to licensed real estate brokers, or both." Thus, if the law be constitutional, the petitioners are not merely engaged in the sale and publication of magazine advertising but by operation of the law have been suddenly transformed into real estate brokers and salesmen.

It seems significant to note that prior to the 1957 amendment, the above quoted definition of a "real estate broker," taken alone, had no more application to the activities of the petitioners than it would have to the advertising operations of a daily newspaper. Yet this definition as it stood prior to 1957 seems quite fully to describe all the factors that we commonly associate with real estate brokerage or salesman-

ship. In short, it never would have occurred to anyone that the purveyor of advertising space was in reality a real estate broker or salesman until by arbitrary legislative definition he was made so.

If the petitioners are subject to the law as now written, what are the practical results? They must satisfy every requirement of R. S., 1954, Chap. 84 before they can lawfully engage in their business of selling and publishing advertisements. They must each procure a license from the Real Estate Commission as required by Sec. 3. They must offer proof which satisfies the Commission that they are trustworthy and competent to transact the business of a real estate broker or salesman as required by Sec. 4. They must submit to a written or oral examination by the Commission as to their qualifications to act as a broker or salesman of real estate and must pay an examination fee, all as required by Sec. 5. They must pay initial and annual renewal license fees as required by Sec. 7. The nonresident broker must appoint the Secretary of the Commission his agent for service of process as required by Sec. 10.

We are greatly aided in our decision by the very recent opinion of the Connecticut court in *United Interchange* v. *Spellacy* (1957), 144 Conn. 647, 136 A. (2nd) 801. The plaintiffs there were engaged in the identical business now being conducted by the petitioners here. Exactly the same methods were employed. The same publications were involved. The court was therefore called upon to decide the same issues of law on the same facts as are presented here. The opinion therefore has unusual relevancy. In 1955 the General Assembly had amended a definition of "real estate business" (and by reference the definitions of broker and salesman) to include "engaging in the business, for a fee, in connection with any contract whereby any person undertakes to promote the sale of real estate through the listing of such property in a publication issued primarily for such

purpose or for referral of information concerning properties to licensed real estate brokers or both." It may be noted that this language was adopted practically verbatim by the Maine Legislature in the amendment to our statute enacted in 1957. For that reason everything said by the Connecticut court in discussing the constitutionality of the amended law has direct application in the instant case.

The court in *Spellacy* pointed out that the legislature may not regulate the lawful business of advertising by arbitrarily and unreasonably defining that business as something it is not. The court used what seems to us an apt illustration at page 805 (of 136 A. (2nd)) when it said: "To take an extreme case, it is questionable whether a legislature could, by defining as a dog an animal having the components of a horse, subject the owner of a horse to the dog licensing statute." The court went on to state that the exercise of the police power is entirely proper to prevent fraud when the facts warrant it, but the method employed to accomplish that lawful purpose may not be unreasonable or unnecessarily arbitrary or discriminatory. The court finally held that the provisions of the amended law "which embrace the plaintiffs' activities within the definition of what constitutes 'engaging in the real estate business' and the activities of a 'real estate broker' or a 'real estate salesman' violate the constitutional rights of the plaintiffs and are null and void."

We are unable to distinguish the situation which was presented to the Connecticut court from that now before us. Minor variations in either the facts or the wording of the legislation in the two states in no way distinguish the cases. We find the reasoning in *Spellacy* persuasive and compelling and are disposed to reach the same result. It is manifestly unfair to demand that a purveyor of advertising space successfully pass an examination in which he must demonstrate special knowledge of and skill in the real estate

business in order that he may continue the business of selling and publishing advertising. As well might legislation require that the advertising salesman for a daily newspaper who sells space to automobile dealers demonstrate the special skill and knowledge of a first class mechanic. The requirement, viewed in proper perspective, is at once seen to be unrealistic and arbitrary. The fact that it may have as a secondary effect the creation of some sort of monopoly for the benefit of licensed real estate brokers and salesmen in no way aids it in this test of its constitutionality.

What is the mischief which the legislation is supposed to prevent? The State presented in this connection the testimony of several disgruntled customers of the petitioners. Some of them had been delinquent in payment of their accounts for the space which they purchased. Each was obviously disappointed because the advertising produced no sale of his property. Only one admits having read the written contract before signing it. The contention that the salesman had represented that payment was conditioned upon a successful sale of the property advertised must yield to the clear and concise terms of the signed contract in accordance with the parol evidence rule. The following sample contract leaves no doubt that advertising was purchased for an agreed sum:

"Date _____

To United Interchange, Inc. of Massachusetts
80 Boylston Street
Boston 18, Massachusetts
Trade Name or
Type of Property _____ Phone _____
Street Address
or Location _____ City _____ State _____

I authorize you to advertise for sale the above business or property and for that purpose reserve space as follows:

You are to advertise the sales information on my business or property to hundreds of brokers by

publication in the next issue of the U. I. Brokers Bulletin. I understand that the United Interchange is not itself a broker.

You are also to advertise the sale of my business or property directly to potential buyers throughout the nation by publication of a ¼ page advertisement in the next issue of the U. I. Buyers Digest.

For this reserved space, I will pay you the sum of $_____ at Boston, Massachusetts, three (3) months from the date of your acceptance of this advertising agreement, unless I enter into an agreement to sell my business or property prior to that time, in which event this sum shall become immediately due and payable. If I default in payment and you commence legal action for collection, I agree to pay reasonable attorney's fees and court costs in such action.

All the terms of this agreement are specifically set forth herein. Please use the information furnished by me on the accompanying data sheet in preparing advertising for me.

This agreement shall become effective only when accepted by your office in Boston, Massachusetts. You shall notify me of such acceptance by letter.

```
                              _____
                                    (Advertiser)
I acknowledge receipt         _____
of a copy of this ad-               (Advertiser)
vertising agreement
```

Advertising Agreement Accepted
at Boston, Massachusetts

_____ 19__
For: United Interchange, Inc. of Massachusetts

By _____ "

In no case was there any suggestion that the advertisement contracted for was not properly published and circulated

in accordance with contract. No doubt the salesmanship was of the so-called "high powered" variety but if this be the true mischief as we strongly suspect, there is no reason to believe it would be cured by transforming advertising salesmen into licensed real estate brokers. In no instance was there credible or satisfactory evidence that any of the petitioners performed acts which could only properly be performed by licensed brokers or salesmen as they were defined before the 1957 amendment. If they had done so, the penalties were applicable and no doubt adequate and might have been enforced. (Secs. 3 and 12.)

The Connecticut court rested its decision entirely upon the improper exercise of the police power and deemed it unnecessary to discuss the possible invasion of freedom of the press although it recognized the issue. We might properly do the same but are prompted to comment on this issue because of the far reaching consequences of any encroachment on that freedom. Since the advertising activities of the daily newspaper and the family magazine differ from those of the petitioners only in the fact that the advertising accepted by the latter is restricted to the field of income producing real estate, the decision in the instant case is of vital concern to the whole press. The protection of the freedom of the press is intended primarily to safeguard the *public* in its right to the circulation of information. This freedom is protected within this state by the fourteenth amendment to the Constitution of the United States and by the Constitution of Maine. The latter document is specific and concise in this respect. Art. I, Sec. 4 provides in part: "* * * no laws shall be passed regulating or restraining the freedom of the press." Historically, the struggle for the freedom of the press was primarily directed against the power of the licensor and was addressed to obtaining liberty to publish "without a license what formerly could be published only with one." *Lovell* v. *City of Griffin,* 303 U. S.

444, 58 S. Ct. 666. The liberty of the press is not of course license to libel or to print the scandalous or the immoral. Rather does the freedom relate to *"previous* restraints" before publication as well as to protection from penalties for publishing what is harmless to the public welfare. The meaning of and recognized exceptions to these basic rules are reviewed in *Near* v. *Minnesota,* 283 U. S. 697, 51 S. Ct. 625, 630. Efforts to undermine this freedom by the device of requiring license or imposing a discriminatory tax have been steadfastly resisted. *Grosjean* v. *American Press Co.,* 297 U. S. 233, 56 S. Ct. 444. The evidence discloses that petitioners support by advertising sales, publish and circulate a magazine which contains information, opinion and advertising. We are not here concerned with any abuse of liberty. No one would seriously contend that the publication of advertisements for the sale of real estate is a proper subject for any "previous restraint." The press can be deprived of its liberty as quickly by previous restraints which destroy its sources of revenue as by a rigid censorship. If by an artificial licensing device, the business of these petitioners can be curtailed or terminated, we see no obstacle to further encroachment on freedom of the press by restrictive legislative device aimed at specific media or even at the whole industry. As was said in *Grosjean* v. *American Press Co., supra,* at page 449 (of 56 S. Ct.) : "* * * and since informed public opinion is the most potent of all restraints upon misgovernment, the suppression or abridgement of the publicity afforded by a free press cannot be regarded otherwise than with grave concern. * * * To allow it to be fettered is to fetter ourselves." We cannot sanction any breach in the wall of protection.

For these reasons so much of R. S., 1954, Chap. 84 as was enacted by the amendment contained in P. L., 1957, Chap. 32 must be held unconstitutional and null and void as ap-

plied to the activities of these petitioners. The petitioners are entitled to a single bill of costs. The entry will be

*Remanded to the court below for a decree in accordance with this opinion. So ordered.*