UNITED STATES of America,
Appellee,

v.

Bill R. HUNTER, d/b/a The Courier,
Appellant.

No. 71–1643.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 29, 1971.

Decided April 27, 1972.

Arthur B. Hanson, Washington, D. C. (W. Frank Stickle, Jr., Ralph N. Albright, Jr., Washington, D. C., on brief), for appellant.

Frank E. Schwelb, Atty., Dept. of Justice (David L. Norman, Asst. Atty. Gen., Walter W. Barnett, Robert J. Wiggers, Attys., Dept. of Justice, and George Beall, U. S. Atty., on brief), for appellee.

Before SOBELOFF, Senior Circuit Judge, and CRAVEN and FIELD, Circuit Judges.

SOBELOFF, Senior Circuit Judge:

This case presents the first occasion for a federal court of appeals to consider certain important issues in the application and enforcement of Title VIII (Fair Housing) of the Civil Rights Act of 1968.

Appellant Bill R. Hunter is editor and publisher of *The Courier*, a weekly newspaper with a circulation of 29,000, chiefly in Prince George's County, Maryland. *The Courier* carries classified advertisements prepared by persons offering dwellings for sale or rent. In January and again in June, 1970, *The Courier* published a classified advertisement tendering for rent a furnished apartment in what was denominated a "white home." [1]

Contending that such advertisements violated § 804(c) of the Civil Rights Act of 1968, 42 U.S.C. § 3604(c),[2] the Attorney General instituted the present action against Hunter to obtain an order enjoining *The Courier's* further publication of advertisements violative of § 3604(c). The Attorney General also prayed for "such additional relief as the interests of justice may require."

Defending against the suit, Hunter disputed the Attorney General's interpretation of § 3604(c). The publisher argued that the section was not intended to apply to a newspaper which published such advertisements; that it would be unconstitutional if so applied; and that, in any event, the statute was not violated by an advertisement specifying that the apartment was located in a "white home."

After a trial, the District Judge denied the Government's request for an injunction, 324 F.Supp. 529, but did grant it a favorable judgment declaring that § 3604(c) was intended to apply to newspapers; was constitutional in its ban on

---

1. The classified advertisement on January 8, 1970 read:

 FOR RENT—Furnished basement apartment. In private white home. Call JO 3-5493.

 The ad on June 18, 1970 read:

 FURNISHED APARTMENT, well located, clean quiet. In white home. Gentlemen only. $17.50 a week. Call JO 3-5493.

 Both ads were placed by an elderly, retired man who lived in southeast Washington, D.C.

2. § 3604 Discrimination in the sale or rental of housing

 (c) [It shall be unlawful] to make, print, or publish, or cause to be made, printed, or published, any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, or national origin, or an intention to make any such preference, limitation, or discrimination.

discriminatory advertisements, including those published by newspapers; and was contravened by the advertisements published in *The Courier*. From these adverse rulings Hunter appeals.

I

Appellant raises essentially the same arguments he unsuccessfully presented to the District Court. Perceiving no more merit in appellant's contentions than did the judge below, we affirm the District Court's declaratory judgment.

A. *Section 3604(c) Prohibits the Publication of Discriminatory Housing Advertisements by Newspapers*

██ Hunter first takes the position that § 3604(c) was not intended to prevent newspapers from publishing classified advertisements indicating a racial or other statutorily proscribed preference in the sale or rental of a dwelling. We reject this assertion, for we find Congress clearly intended that very prohibition.

██ Legislative intent is first to be gathered from the plain meaning of the words of the statute. It is presumed that statutory language is used in its ordinary sense, with the meaning commonly attributed to it, unless the contrary clearly appears. Caminetti v. United States, 242 U.S. 470, 485–486, 37 S.Ct. 192, 61 L.Ed. 442 (1917). The section here under examination provides on its face no exemptions in favor of newspapers. Rather, it uses precisely the language which would lead the ordinary reader to conclude that newspapers are to be brought within its purview. The section provides it shall be unlawful "to make, print, publish, or cause to be made, printed, or published" any advertisement prohibited by the Act. In the context of classified real estate advertising, landlords and brokers "cause" advertisements to be printed or published

and generally newspapers "print" and "publish" them. Since each phrase in a statute must, if possible, be given effect, United States v. Menasche, 348 U.S. 528, 538–539, 75 S.Ct. 513, 99 L.Ed. 615 (1955), both landlords and newspapers are within the section's reach.

Hunter attempts to draw an analogy to Brush v. San Francisco Newspaper Printing Co., 315 F.Supp. 577 (N.D.Cal. 1970) (appeal pending, No. 26,666, 9th Cir.), in which it was held that § 704(b) of the Civil Rights Act of 1964, 42 U.S. C. § 2000e–3, does not include newspapers in its proscription of discriminatory employment advertisements. *Brush*, however, is inapposite, because the section there involved is fundamentally different from our § 3604(c) in that the 1964 Act specifically lists the persons regulated: "an employer, labor organization, or employment agency." The *Brush* court held that a newspaper was none of these and that, under the maxim *expressio unius est exclusio alterius*, it did not fall within the Act's restriction. Moreover, *Brush* relied on a clear statement in the legislative history of the 1964 Act that newspapers were not required to exercise any control or supervision over the advertisements they published. In contrast to the section construed in *Brush*, no restriction in scope appears on the face of § 3604(c). Unlike other sections of the Fair Housing title,[3] § 3604(c) does not provide any specific exemptions or designate the persons covered, but rather, as the court below noted, applies on its face to "anyone" printing or publishing illegal advertisements. *Brush* is, therefore, not persuasive in interpreting the instant section.

Congressional intent disclosed by the meager legislative history concerning § 3604(c) does not contradict our view of the unambiguous language chosen by the draftsmen of the section.[4] Indeed there

---

3. *E. g.*, §§ 803(b), 805 and 807 (42 U.S.C. §§ 3603(b), 3605 and 3607).

4. Title VIII was added by the Senate as an amendment to H.R. 2516, the civil rights bill passed by the House. The Senate amendment was a revision of S. 1358, an earlier fair housing bill on which hearing had been held in 1967. *See* Hearings Before the Subcommittee on

is some evidence that the publication of discriminatory classified advertisements in newspapers was precisely one of the evils the Act was designed to correct. *See* Hearings on S. 1358, S. 2114 and S. 2280 before the Subcommittee on Housing and Urban Affairs, Senate Committee on Banking and Currency, 90th Cong. 1st Sess. at 386, 388 (1967). (George Meany's testimony, complaining of discriminatory housing advertisements in newspapers.)

■ We therefore agree with the District Court that the congressional prohibition of discriminatory advertisements was intended to apply to newspapers as well as any other publishing medium.

B. *The Constitution Does Not Prohibit the Application of § 3604(c) to Newspapers*

Hunter next asks us to overturn § 3604(c) as violative of the First and Fifth Amendments of the United States Constitution.

1. *Freedom of the Press*

■ Noting that § 3604(c) limits advertising an intent to discriminate in the sale or rental of a dwelling only in a commercial context and not in relation to the dissemination of ideas, the District Court held that the statute does not contravene the First Amendment, and hence that a court might constitutionally enjoin a newspaper's printing of classified advertisements which violate the Act.[5]

■ The court's conclusion is supported by an unbroken line of authority from the Supreme Court down which distinguishes between the expression of ideas protected by the First Amendment and commercial advertising in a business context.[6] It is now well settled that, while "freedom of communicating information and disseminating opinion" enjoys the fullest protection of the First Amendment, "the Constitution imposes no such restraint on government as respects purely commercial advertising." Valentine v. Chrestensen, 316 U.S. 52, 54, 62 S.Ct. 920, 921, 86 L.Ed. 1262 (1942). *See* Breard v. City of Alexandria, 341 U.S. 622, 641–645, 71 S.Ct. 920, 95 L.Ed. 1233 (1951); New York State Broadcasters Ass'n, Inc. v. United States, 414 F.2d 990, 998–999 (2nd Cir. 1969), cert. denied, 396 U.S. 1061, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); Banzhaf v. FCC, 132 U.S.App.D.C. 14, 405 F.2d 1082, 1099–1103 (1968), cert. de-

Housing and Urban Affairs of the Senate Comm. on Banking and Currency, 90th Cong. 1st Sess. (1967). Since the Committee took no action on S. 1538, the bill did not reach the floor and no explanatory reports were published. Because Title VIII was passed as an amendment on the Senate floor, other than the 1967 Senate Committee hearings, the legislative history of the title consists mainly of the limited debates on the floors of the respective houses of Congress. The genesis of Title VIII is traced in B. Schwartz, Statutory History of the United States: Civil Rights, 1629–1632 (1970); Dubofsky, Fair Housing: A Legislative History and a Perspective, 8 Washburn L.J. 149 (1969).

5. Since the institution of the present suit, one other district court has specifically upheld the constitutionality of § 3604(c) as applied to newspapers. Holmgren v.

Little Village Community Reporter, 342 F.Supp. 512 (N.D.Ill.1971).

6. Professor Emerson defines the "commercial sector" as "roughly" embracing "the production and exchange of goods and services for profit, as distinct from the production or exchange of ideas on political, religious, artistic and similar matters." T. Emerson, The System of Freedom of Expression 414 (1970). *See also* Note, Freedom of Expression in a Commercial Context, 78 Harv.L.Rev. 1191, 1192, 1194–95 (1965).

Of course, paid advertisements which communicate grievances, protest claimed abuses, seek financial aid for a cause, or engage in other protected expressions are not restrained by the Act. *See* New York Times Co. v. Sullivan, 376 U.S. 254, 265–266, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Smith v. California, 361 U.S. 147, 150, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959).

**212**

nied, sub nom. Tobacco Institute, Inc. v. FCC, 396 U.S. 842, 90 S.Ct. 50, 24 L. Ed.2d 93 (1969); Capital Broadcasting Co. v. Mitchell, 333 F.Supp. 582 (D.D.C. 1971), (three-judge court), aff'd, sub nom. Capital Broadcasting Co. v. Kleindienst, Acting Attorney General, 405 U. S. 1000, 92 S.Ct. 1289, 31 L.Ed.2d 472 (1972).

Relying on this difference, district courts have uniformly held that § 3604(e), banning blockbusting practices, does not contravene the First Amendment. United States v. Mitchell, 327 F. Supp. 476, 486 (N.D.Ga.1971); United States v. Bob Lawrence Realty, Inc., 313 F.Supp. 870, 872 (N.D.Ga.1970); United States v. Mintzes, 304 F.Supp. 1305, 1312 (D.Md.1969).

The publisher's response to the cases distinguishing between commercial advertising and other forms of expression is that the distinction is "meaningless in the context of the newspaper publishing business" because the revenue newspapers derive from advertising makes possible the publication of the rest of the paper. But it has been held that a newspaper will not be insulated from the otherwise valid regulation of economic activity merely because it also engages in constitutionally protected dissemination of ideas. Lorain Journal Co. v. United States, 342 U.S. 143, 155–156, 72 S.Ct. 181, 96 L.Ed. 162 (1951); Associated Press v. United States, 326 U.S. 1, 6–7, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945). While it is true, as Hunter contends in his brief, that "a newspaper can be silenced as easily by cutting off its source of funds, as it can be by enjoining its publication," no such

threat is raised by the Act's prohibition of racially discriminatory advertisements. Nondiscriminatory advertisements are still permitted. Since the Act also bars private publication of discriminatory advertisements, an advertiser has no incentive to abandon his regular use of newspapers to publicize his offer to sell or rent. We therefore doubt that the Act will deprive a newspaper of any revenue. Thus, the statute before us, unlike the schemes overturned in Grosjean v. American Press Co.,[7] and United Interchange, Inc. of Massachusetts v. Harding,[8] cited by Hunter, will not adversely affect the valid dissemination of opinion or information.[9]

Congressional regulation of commercial advertising is not barred by Near v. Minnesota, 283 U.S. 697, 51 S. Ct. 625, 75 L.Ed. 1357 (1931), which condemned unlawful prior restraints on free speech. The Supreme Court and lower courts have frequently rejected First Amendment attacks on injunctions when the enjoined conduct or expression was not fully protected by the First Amendment. Lorain Journal Co. v. United States, *supra* (unanimous opinion upholding injunction prohibiting publisher from accepting or rejecting commercial advertisements of others in violation of the antitrust laws); Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 439, 31 S.Ct. 492, 55 L.Ed. 797 (1911) (upholding injunction against union newspaper promoting boycott). *See also* Head v. New Mexico Board of Examiners, 374 U.S. 424, 432 n. 12, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963) (injunction restraining newspaper from publishing optometrist's advertising af-

7. 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936).

8. 154 Me. 128, 145 A.2d 94 (1958).

9. Contrary to the contentions in Hunter's brief, nothing in the statute or the relief requested by the Attorney General prohibits a newspaper from publishing news accounts concerning racial discrimination in housing, or criticizing the Government's enforcement of the Fair Housing Title, or editorially advocating repeal of

the Act. *Cf.* Capital Broadcasting Co. v. Mitchell, 333 F.Supp. 582 (D.D.C.1971), aff'd, sub nom. Capital Broadcasting Co. v. Kleindienst, Acting Attorney General, 405 U.S. 1000, 92 S.Ct. 1289, 31 L.Ed.2d 472 (1972). Only publication of advertisements which indicate a discriminatory preference for certain customers in seeking a buyer or a renter of a dwelling—a commercial transaction—is proscribed.

firmed against attack based on the due process clause). In concluding that an injunction under § 3604(c) would not violate the First Amendment, we have also considered Hunter's recital of possible economic damages to a publishing business operating under such a court order. We think his fears of economic consequences are overdrawn. Furthermore, as a matter of law, his argument is answered by the Supreme Court's unanimous affirmance of injunctive relief against a newspaper in Lorain Journal Co. v. United States, *supra*.

Finally, a newspaper publisher can easily distinguish between permissible and impermissible advertisements in discharging his duty to reject those that violate § 3604(c). In contrast to "printer's ink" statutes which make false advertising a crime, and which either legislatively or judicially exempt newspapers, *see generally* Note, Regulation of Advertising, 56 Colum. L.Rev. 1018 (1956), a publisher can readily determine from the face of an advertisement whether it is intended to express a discriminatory preference. However the language of the advertisement is couched, the purpose of an advertiser who wishes to publish an advertisement in violation of the Act is to communicate his intent to discriminate and a newspaper publisher can divine this intent as well as any of his readers.

Accordingly application of § 3604(c) to newspapers does not contravene freedom of the press protected by the First Amendment.

### 2. *Due Process*

Hunter also argues that banning a newspaper's publication of dis-criminatory housing advertisements violates a publisher's rights under the due process clause. He contends syllogistically that, since a private, single-family homeowner, and a "Mrs. Murphy" landlord are permitted by § 3603(b) to effectuate their discriminatory preferences by refusing to sell or rent certain dwellings to a particular racial, religious, or ethnic group,[10] they must also, either as a constitutional right or as a matter of statutory construction, be entitled to communicate in commercial advertising their intent to so discriminate. Therefore, the argument goes, if those persons may communicate their discriminatory intent, it is a violation of equal protection of the laws, *cf.* Bolling v. Sharpe, 347 U.S. 497, 500, 74 S.Ct. 693, 98 L.Ed. 884 (1954), or alternatively a deprivation of liberty or property without due process of law for Congress to deprive newspapers of the right to publish the same lawful communications.

We reject Hunter's conclusion because we cannot accept the premises upon which he rests his syllogism. While the owner or landlord of an exempted dwelling is free to indulge his discriminatory preferences in selling or renting that dwelling, neither the Act nor the Constitution gives him a right to publicize his intent to so discriminate.

Clearly, there is no such statutory right. Section 3603(b) establishes an exemption only from the prohibitions set forth in § 3604(a)(b) and (d). The Act specifically states that subsection (c) of § 3604 shall apply to sellers or lessors of dwellings even though they are otherwise exempted by § 3603(b). The draftsmen of the Act could not have made more explicit their purpose to bar

---

10. Section 3603(b) (1) lists a number of circumstances by which a "single-family house sold or rented by an owner" will be *exempted from the Act's prohibition of refusing to sell or rent a dwelling because of one's color, race, religion or national origin.* Section 3603(b) (2) exempts "Mrs. Murphy's" now renowned rooming-house, *i. e.*, "rooms or units in dwellings containing living quarters occupied or in-tended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as his residence."

It appears that the rooms in the "private white home" offered for rent in the advertisements published by *The Courier* qualify the owner for the Mrs. Murphy exemption.

all discriminatory advertisements, even those printed or caused to be printed by persons who are permitted by § 3603(b) to discriminate in selling or renting. During the House debate on the Fair Housing Title, Representative Celler, a supporter of the bill, said:

> If one [otherwise exempted by § 3603(b)] advertised in a mass media communication like a newspaper using discriminatory material, then one would come within the purview of the fair housing title.

114 Cong.Rec. 6490 (March 14, 1968).

▮▮▮ Nor is there any constitutional requirement that sellers or lessors of otherwise exempted dwellings be permitted to advertise their intent to discriminate. As established above, the First Amendment is not violated by a regulation appertaining only to commercial activity such as the publication of an advertisement offering to sell or rent a dwelling. If the prohibition of discriminatory advertisements is to be struck down, it must be because it is violative of the due process clause. Regulation of commercial advertising has withstood due process attack when the end is legitimate and reasonably related to the means employed. *E. g.*, Semler v. Oregon State Board of Dental Examiners, 294 U.S. 608, 610, 55 S.Ct. 570, 79 L.Ed. 1086 (1935) (upholding statute forbidding dentists from advertising prices); Capital Broadcasting Co. v. Mitchell, *supra* (sustaining a ban on cigarette commercials advertised on radio and television).

▮▮▮ The Fair Housing Title was designed to provide fair housing throughout the nation and is a valid exercise of congressional power under the Thirteenth Amendment to eliminate badges and incidents of slavery. United States v. Mintzes, 304 F.Supp. 1305 1312–1313 (D.Md.1969); Brown v. State Realty Co., 304 F.Supp. 1236, 1240 (N. D.Ga.1969). *See* Jones v. Alfred H. Mayer Co., 392 U.S. 409, 439–440, 88 S. Ct. 2186, 20 L.Ed.2d 1189 (1968). In combating racial discrimination in housing, Congress is not limited to prohibiting only discriminatory refusals to sell or rent. Widespread appearance of discriminatory advertisements in public or private media may reasonably be thought to have a harmful effect on the general aims of the Act: seeing large numbers of "white only" advertisements in one part of a city may deter nonwhites from venturing to seek homes there, even if other dwellings in the same area must be sold or rented on a nondiscriminatory basis. Considerations of this nature are highlighted by the Fifth Circuit's model decree in United States v. West Peachtree Tenth Corp., 437 F.2d 221, 229 (5th Cir. 1971). There the operators of an apartment complex were not only enjoined from violating § 3604(c), but also directed to include affirmative fair housing statements in all advertising, both in the defendant's own pamphlets and brochures, and in newspapers published by others.

Thus Congress has acted within the bounds of its constitutional power in prohibiting all discriminatory advertising of any dwelling, notwithstanding that some dwellings are otherwise exempted from the Act. If an individual advertiser has no constitutional or statutory right to circulate a discriminatory housing advertisement, a newspaper can stand in no better position in printing that unlawful advertisement at the individual's request. *See* Head v. New Mexico Board of Examiners, 374 U.S. 424, 432 n. 12, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963). Hunter's finespun argument falls, then, because his syllogism is without a solid foundation.

▮▮▮ Moreover, even if private homeowners and "Mrs. Murphy" landlords were constitutionally or statutorily excluded from § 3604(c)'s coverage— and they are not—neither due process nor equal protection is abridged by a statute forbidding newspapers from carrying discriminatory housing advertisements. *See* Railway Express Agency, Inc. v. New York, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949) (prohibition against vehicles advertising another

company's goods held valid against due process and equal protection attack). Newspapers have a far more widespread coverage than privately circulated advertisements, magnifying the already mentioned deleterious effect discriminatory advertisements might have on the congressional purpose in the Fair Housing Title. In holding constitutional regulation of advertising in another context, the Supreme Court has said:

> Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature might think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination. We cannot say that point has been reached here. (Citations omitted.)

Williamson v. Lee Optical Co., 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). *See* Capital Broadcasting Co. v. Mitchell, *supra.* Even if the ban on discriminatory housing advertisements applied only to public media, we hold such a classification to be reasonable and within the discretion of Congress.

C. *Advertisements Stating that Apartments are in a "White Home" Indicate a Racial Preference, And Therefore are Prohibited by § 3604 (c)*

 To the ordinary reader the natural interpretation of the advertisements published in *The Courier* is that they indicate a racial preference in the acceptance of tenants.[11] Indeed, the indication of a racial limitation is precisely what the writer of the advertisements published in *The Courier* intended when he

used the words "white home." He later explained his reason for including the phrase in his ad: "It's really a kindness to colored people. There's no use making them \* \* \* come here when I'm not going to rent to them." Accordingly, the District Court correctly held that the two advertisements published by *The Courier* violated the Act.

Any other interpretation of the advertisements would severely undercut the objectives of the legislation. If an advertiser could use the phrase "white home" in substitution for the clearly proscribed "white only," the statute would be nullified for all practical purposes. We cannot condone an interpretation which would circumnavigate congressional intent in this remedial statute designed to eliminate the humiliation and social cost of racial discrimination. *See* Nesmith v. Young Men's Christian Association of Raleigh, 397 F.2d 96, 100 (4th Cir. 1968); Miller v. Amusement Enterprises, 394 F.2d 342 (5th Cir. 1968).

For the reasons above stated in sections A, B, and C of this part of the opinion, we affirm the District Court's grant of a declaratory judgment.

II

Although we uphold the District Court's judgment with respect to § 3604(c), we are constrained to comment on the approach taken by the court in determining whether to grant the Attorney General relief under the Act. This is a case of first impression and the District Court's methodology may hereafter be relied on by other litigants and judges in Civil Rights cases. We therefore undertake an examination of the court's stated reasons for denying the requested injunctive relief, and an analysis of its decision nevertheless to grant a declaratory judgment. The parties pressed no error in these respects, yet to

---

11. The Secretary of Housing and Urban Development has promulgated Advertising Guidelines for Fair Housing, 37 F.R. 6700 (April 1, 1972), which explicitly provide

not only that newspapers are subject to the Act, but also that a phrase like "white home" is presumed discriminatory.

allow what we deem an erroneous view of the law to remain undisturbed would light a false beacon with the possibility of harmful consequences of a general public nature.

## A. *The District Court's Approach*

The Attorney General is empowered by § 813 of the Civil Rights Act of 1968, 42 U.S.C. § 3613, to enforce the Fair Housing Title of the Act. That section provides:

> Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this subchapter, *or* that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance, he may bring a civil action in any appropriate United States district court by filing with it a complaint setting forth the facts and requesting such preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for such pattern or practice or denial of rights, as he deems necessary to insure the full enjoyment of the rights granted by this subchapter. (Our italics.) [12]

In the District Court, the Attorney General argued that under either of the alternative grounds specified in § 3613, he was entitled to an injunction and "such additional relief as the interest of justice may require."

In construing § 3613, the Judge noted that

> [B]efore granting relief, [a court] should determine that such a pattern or practice of resistance exists or that there has been such denial of rights as would justify the granting of the relief prayed.

324 F.Supp. at 530–531.

After hearing the evidence, the court denied the requested injunction because, in its stated view, the Government failed to prove either that a pattern or practice of resistance existed or that the case raised an issue of general public importance. It also grounded its refusal on equitable principles, namely that (1) an injunction was not necessary since it was satisfied that defendant would abide

---

12. Due to the origin of the Fair Housing Title, *see* note 4, *supra*, there appears no helpful legislative history concerning § 3613. The governmental enforcement provision apparently stirred no controversy and was adopted without clarifying remarks. The section was plainly modeled after the governmental enforcement provisions of the Civil Rights Act of 1964, most notably, the twin sections 206 and 707 (42 U.S.C. §§ 2000a–5 and 2000e–6). These sections authorize suit by the Attorney General in public accomodations and equal employment cases if he has "reasonable cause to believe that * * * a pattern or practice of resistance" exists. In addition, these sections provide that, if the Attorney General certifies that the case is also one of "general public importance," he may request the empaneling of a three-judge court. In drafting the enforcement section of Title VIII in 1968, Congress retained the "pattern or practice" language verbatim. It omitted the resort to a three-judge court and instead made the existence of a case "raising an issue of general public importance" an alternative basis for the Attorney General's action.

The reason for creating an alternate ground for suit is unexplained. The present language of § 3613 was first included in an amendment proposed by Senator Dirksen as a substitute for the original proposed amendment adding a fair housing title to H.R. 2516. *Compare* § 13 of the original proposed fair housing amendment, 114 Cong.Rec. 2271 (Feb. 6, 1968), *with* § 213 of the Dirksen substitute amendment, 114 Cong.Rec. 4573 (Feb. 28, 1968). The change was viewed as an expansion of the Attorney General's power to enforce the Fair Housing Title. Dubofsky, Fair Housing: A Legislative History and a Perspective, 8 Washburn L.J. 149, 157 (1969).

The close similarity in the terms employed in § 3613 and §§ 2000a–5 and 2000e–6 accounts for our reliance on the legislative and judicial interpretation of the latter in our construction of the words in § 3613. *See* United States v. West Peachtree Tenth Corp., 437 F.2d 221, 227 (5th Cir. 1971).

by the law as pronounced by the court in a declaratory judgment, and (2) the Attorney General had singled out *The Courier* for legal action but had not sued to enjoin identical continuing activities of larger nearby newspapers.

B. *Statutory Prerequisites for Relief*

The District Court correctly stated its obligation to give relief only when the Government established that either a pattern or practice of resistance or a case raising an issue of general public importance is present. Section 3613 does not grant the Attorney General unlimited authority. The language of the section shows that Congress did not wish the Attorney General to enforce private civil rights created by the Act unless a specific violation has a measurable *public* impact in that it is either one of a pattern or practice of resistance *or* a case raising an issue of general public importance. If *neither* prerequisite for relief existed, a district court would be required to refuse the relief sought by the Attorney General. *See* United States v. Bob Lawrence Realty, Inc., 327 F.Supp. 487 (N.D.Ga.1971). *Cf.* United States v. Gray, 315 F.Supp. 13 (D.R.I.1970).[13]

We find no fault with the District Court's determination that a pattern or practice of resistance was not shown in this case. The same phrase is also found in the Civil Rights Act of 1964.[14] The 1964 legislative history clearly shows that Congress intended a "pattern or practice" to be more than an isolated or accidental instance of conduct violative of the Act, but rather, as the term "resistance" connotes, an intentional, regular, or repeated violation of the right granted by the Act. *See* United

States v. Mitchell, 327 F.Supp. 476 (N.D.Ga.1971) (applying the 1964 legislative history in construing § 3613).

In the case now before us, *The Courier* published only two allegedly discriminatory advertisements. The first was published before the Act was called to the defendant's attention; the second, some six months later, was printed without his authorization due to an employee's failure to bring the content of the advertisement to Hunter's attention as he had previously directed. Hunter noticed the second advertisement only when the advertiser asked the paper to run this second ad for another week. Once informed, the defendant refused to allow the ad to run again. In light of these facts, the District Court determined that Hunter's sporadic and unintentional violations did not constitute a "pattern or practice of resistance."

But we emphatically do not agree with the court's conclusion that the Government failed to establish the alternative basis upon which relief could be granted —a case raising "an issue of general public importance." In determining that no such case was established, the court pointed out that no one was known to have complained of the advertisement published by *The Courier* and that similar ads are regularly carried in the major newspapers in nearby Washington, D. C.

We deem the absence of individual complaints and the continuance of similar violations by others to be irrelevant in determining whether a case raises an issue of general public importance, particularly in light of the clear congressional meaning attaching to this provision in its legislative history. Although the term is not defined in either the 1968 Act or its legislative history,

13. It has been uniformly held that the question whether pattern or practice of resistance or a case of general public importance has been shown is for the court to determine, even though the Attorney General has alleged that *he* has reasonable cause to believe that a requisite ground for relief is present. *See* United States v. Mitchell, 313 F.Supp. 299, 300 (N.D.Ga.1970) (applying § 3613); Dob-

bins v. Local 212, 292 F.Supp. 413, 443 (S.D.Ohio 1968) (applying § 2000e–6); United States v. Gray, 315 F.Supp. 13, 19–23 (D.R.I.1970) (applying § 2000a–5). *See also* the remarks of Senator Humphrey, 110 Cong.Rec. 14270 (June 18, 1964).

14. *See* note 12, *supra.*

the 1964 Civil Rights Act uses the nearly identical term, "case of general public importance," in authorizing three-judge courts in §§ 206 and 707 and in empowering the Attorney General to intervene in private suits, § 902. In the legislative history of the 1964 Act, a case of general public importance was defined as one where:

> the points of law involved in it are of major significance or * * * the particular decision will constitute a precedent for a large number of establishments * * *.

110 Cong.Rec. 12713 (June 4, 1964) (Senator Humphrey, floor manager for the Bill). The draftsmen unquestionably meant to incorporate this definition into the 1968 Act when they used the term "raises an issue of general public importance." [15]

In the case at bar, a decision would be a precedent of "major significance" in future application of § 3604(c) to all newspapers.[16] No previous case presented the issue of the constitutionality of that section as applied to newspapers, or whether a reference to a "white home" was violative of the statute. A firm precedent was needed, particularly if other newspapers were to be brought into compliance without costly litigation. The questions of the scope and constitutionality of § 3604(c) plainly raised a classic issue of general public importance, affording a necessary prerequisite for relief, independent of whether a pattern or practice of resistance was also shown to exist.[17] The District Court was clearly in error, then, in deciding that the case did not raise an issue of general public importance.

Correction of this error is essential to affirming the District Court's grant of a declaratory judgment. Although properly holding that relief is available only where a pattern or practice of resistance or a case raising an issue of general public importance is proved, the District Court granted the Government a favorable declaratory judgment, notwithstanding its double determination that neither prerequisite for relief was established in the instant case. Since a declaratory judgment, no less than an injunction, is a form of relief under the Act,[18] it may be issued only after one or the other prerequisite for relief has been shown to exist. Thus, it would be illogical to grant a declaratory judgment in the Government's favor, while denying it an injunction for failure to establish a basis for relief. But, since we hold that this case raises an issue of general public importance, there appears a solid framework for granting relief under the Act. The appropriate form of that relief is the next topic for discussion.

## C. The, Choice of Appropriate Relief

As in all cases, upon determining that the minimum prerequisite for

---

15. Although Congress reworded the phrase "case of general public importance" so that suit may be instituted by the Attorney General if there is a denial of rights and "such denial raises an issue of general public importance," the slight variation in style does not deter us from turning for guidance to the legislative history of the 1964 language. Indeed, in both the House and Senate floor debate in 1968, the 1964 phraseology was used interchangeably with the 1968 variation. See 114 Cong.Rec. 4908 (March 2, 1968) (Senate debate); 114 Cong.Rec. 8651 (April 2, 1968); 114 Cong.Rec. 9561 (April 10, 1968) (House debate).

16. The "nation's leading daily newspapers" are said to have taken interest in the suit against The Courier. Editorial, "A Free Press," The Courier, Thursday, July 16, 1970, p. 4.

17. In contrast to the 1964 Act, a pattern or practice of resistance is not an indispensable prerequisite for relief. Relief may be based on a single (unintentional) violation of the Act when by that violation a group of persons are denied their statutory rights and the case raises an issue of general public importance. Here the rights of all nonwhites looking for an apartment were abridged by the illegal advertisements published in The Courier.

18. See note 19, infra.

relief is present, the judge must choose from the spectrum of available remedies, that which is suitable. F.R.Civ.P. Rule 54(c).

 In the course of the trial, the District Court commented that it might not grant an injunction on the evidence presented, but stated in substance that it would enter an order in the nature of a declaratory judgment fully determining the questions of law presented by both sides. The parties agreed to this procedure; defendant Hunter because he desired a final adjudication whether he was subject to the provisions of the Act, and the Attorney General because he required a resolution of the novel issues in a concrete case. Ultimately, the District Court did refuse the injunction and gave the Government a favorable declaration concerning the applicability of § 3604(c) to the case.

 We find no abuse of discretion in denying the injunction and granting, in its place, declaratory relief to the Government.[19]

Established principles of equity dictate that in considering whether to grant injunctive relief a court should impose upon a defendant no restriction greater than necessary to protect the plaintiff from the injury of which he complains. *See* McClintock on Equity § 146 (2d ed. 1948). In the instant cir-

cumstances, the District Judge believed a declaration of the law would be as effective a remedy as the issuance of an injunction because he was firmly convinced that the defendant, although opposing the Government's interpretation of § 3604(c), would obey the law as declared by the court.

Such a standard for refusing an injunction has been utilized by the Supreme Court. In affirming the denial of an injunction in an antitrust case, the Court said:

> Along with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct. The purpose of an injunction is to prevent future violations * * *. But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation * * *. To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations.

United States v. W. T. Grant Co., 345 U. S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953) (citations omitted). *See also* United States v. Oregon State Medical Society, 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952).

---

19. Declaratory relief is among the possible remedies available to the District Court under § 3613. The section provides that the Attorney General may request:

> * * * such preventive relief, including an application for a permanent or temporary injunction, restraining order, *or other order* against the person or persons responsible for such pattern or practice or denial of rights, as he deems necessary to insure the full enjoyment of the rights granted by this subchapter. (our italics).

It is difficult to imagine what the phrase "or other order" possibly encompasses if not declaratory relief. Declaratory judgments are no longer such curiosities that they would have to be specifically called by name.

Furthermore, in an appropriate case, a declaratory judgment may constitute a form of "preventive relief" mentioned in

§ 3613. Apparently, the Government also believes that declaratory relief in this case would effectively prevent further violations by Hunter because it did not appeal from the denial of the injunction. Furthermore, after the entry of a declaratory judgment, 28 U.S.C. § 2202 allows the application for additional relief (including coercive relief) based upon the declarations previously made. *See* Teas v. Twentieth Century-Fox Film Corp., 413 F.2d 1263, 1267 (5th Cir. 1969). Since the present declaratory judgment has determined the issue of *The Courier's* prior publication of illegal advertisements, it may also be used in case of Hunter's future violation to establish that the defendant engages in a pattern or practice of resistance.

Thus, a declaratory judgment, no less than an injunction, is a possible remedy under § 3613.

This standard was also endorsed in Bailey v. Patterson, 206 F.Supp. 67, 70 (S.D.Miss.1962), a civil rights case in which the district court granted the plaintiffs a favorable declaratory judgment, but denied the sought-after injunctive relief. The district court there declared that the Negro plaintiffs had a constitutional right to integrated interstate transportation facilities, but refused the injunction because it believed that the defendants would not thereafter violate plaintiff's right. The Fifth Circuit reversed the trial judge's decision, 323 F.2d 201, 205–206 (5th Cir. 1963), but did so because the district court's finding that the defendants would not continue to discriminate was unsupported by the record. *See also* United States v. Atkins, 323 F.2d 733, 739–740 (5th Cir. 1963), where the district court's denial of requested injunctive relief was reversed as an abuse of discretion because the Court of Appeals saw a "cognizable danger" of recurrence. We can find no similar error in the decision here under review, and agree with the District Court that Hunter is sufficiently unlikely to continue violating the Act as to make injunctive relief not warranted.[20]

■ We hasten to add, however, that our decision is in no way intended to deprecate injunctions as appropriate remedies in housing discrimination cases. Trial judges must remain vigilant to protect minorities from deprivation of their statutory and constitutional rights. An injunction should not be refused upon the mere *ipse dixit* of a defendant that, notwithstanding his past misconduct, he is now repentant and will hereafter abide by the law. Denial of an injunction is proper only in cases where, after hearing the defendant and examining the particular circumstances of the violations involved, including the existence of a pattern or practice of past violations, the judge is fully satisfied that the defendant will not continue his unlawful conduct. *See* United States v. Oregon State Medical Society, *supra*; NAACP v. Thompson, 357 F.2d 831, 838 (5th Cir.), cert. denied, sub nom. Johnson v. NAACP, 385 U.S. 820, 87 S.Ct. 45, 17 L.Ed.2d 58 (1966); Bailey v. Patterson, supra.[21]

■ We deal next with the District Court's second equitable ground for denying the requested injunction, namely that the Government failed to sue other newspapers in nearby Washington, D. C., which print similar discriminatory advertisements, but chose to move against *The Courier* alone. The District Court invoked the equitable maxim that to obtain the benefit of equity, a plaintiff must himself do equity. We cannot agree that this maxim was appropriately invoked here as a basis for denying the injunction. Surely, the defendant cannot be heard to complain that the Attorney General, in discharging his executive responsibilities, has chosen to sue *The Courier* first and not, for example, *The Washington Post*. Such a choice is well within the prosecutor's discretion. *See, e. g.,* Smith v. United States, 375 F.2d 243, 247 (5th Cir.), cert. denied, 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967). If defendant's argument were generally accepted, the Government's enforcement effort would be crippled in such areas as antitrust, environmental protection, and labor, as well as civil rights. Indeed, § 3613 does not require

---

20. We also note that in Bailey v. Patterson and United States v. Atkins, a pattern or practice of resistance was established and, in such a case, the likelihood of future resistance may be more substantial than where, as here, only sporadic violations were proved.

21. Of course, an injunction may issue, even though the prior discrimination has ceased, and affirmative relief should be granted where the vestiges of prior discrimination linger and remain to be eliminated. Louisiana v. United States, 380 U.S. 145, 156, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965); United States v. West Peachtree Tenth Corp., 437 F.2d 221, 228 (5th Cir. 1971). In the instant case, no such effect was alleged to remain and none was found by the District Judge.

the Attorney General to sue in *every* case where he has reasonable cause to believe that a pattern or practice of resistance or a case of general public importance exists, and for the court to question the Government's choice of a defendant would be an impermissible judicial interference with executive discretion. *Cf.* United States v. Mitchell, 313 F.Supp. 299, 300 (N.D.Ga.1970); United States v. Gray, 315 F.Supp. 13, 22–24 (D.R.I.1970).

 Thus, were the official's choice of a defendant the only ground offered by the District Court for refusing the injunction, we would be compelled to reverse the decision as an abuse of discretion. But the Judge gave a valid alternative reason—the defendant's likely future compliance with the law—and upon that basis alone the denial of the injunction and the substitution of a declaratory judgment is a proper exercise of equitable discretion.

### Summary

We have endeavored to outline for future cases the approach a trial judge should take in deciding whether to grant the Government relief in Fair Housing cases, and in determining whether injunctive or declaratory relief is appropriate. While the District Court in the instant case was not entirely correct in the reasons it gave for declining to issue an injunction and giving instead a declaratory judgment, the result ultimately reached was lawful and comported with the facts of the case.

As for the substance of the declaratory judgment, we are in accord with the court's holding that Congress intended § 3604(c) to apply to newspapers; that, so applied, the section is constitutional; and that the Act was violated by the advertisements published in *The Courier* stating that the apartment for rent was located in a "white home." The judgment is therefore

Affirmed.