Luther M. RAGIN, Jr., Deborah Fish Ragin, Renaye B. Cuyler, Jerome F. Cuyler, and Open Housing Center, Inc., Plaintiffs,

v.

THE NEW YORK TIMES COMPANY, Defendant.

No. 89 Civ. 0228 (CSH).

United States District Court, S.D. New York.

Dec. 18, 1989.

Shearman & Sterling, New York City, for plaintiffs; Kathleen M. Comfrey, Elsie A. Crum, Cheryl Packwood, of counsel.

The New York Times Co., Legal Dept., New York City, for defendant; George Freeman, Deborah R. Linfield, Kenneth A. Richier, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiffs in this action, Luther M. Ragin, Jr., Deborah Fish Ragin, Renaye B. Cuyler, and Jerome F. Cuyler, allege that they are "black persons and citizens of the United States who have been looking for housing in the New York City Metropolitan area." Complaint, ¶ 4, 5. Plaintiff Open Housing Center is a not-for-profit New York corporation, one of whose purposes "is to promote equal opportunity in housing in the New York metropolitan area." Complaint, ¶ 6.

These plaintiffs have sued defendant The New York Times Company, which publishes a daily newspaper, *The New York Times* (hereinafter collectively "the Times"). Plaintiffs complain that for over twenty years the Times has printed and published discriminatory display advertisements for the sale or rental of apartments, condominiums, cooperatives and/or single family homes. Plaintiffs make two specific charges. First, although "[a]t least 20% of the population of New York City's five boroughs is black", during this twenty year period "display advertisements appeared in the Sunday Times featuring thousands of human models of whom virtually none were black.... [W]hile many of the white human models depict representative or potential homeowners or renters, the few blacks represented are usually depicted as building maintenance employees, doorman, entertainers, sports figures, small children or cartoon characters." Complaint, ¶ 12. Second, plaintiffs charge the Times with violating logotype requirements contained in federal regulations with respect to real estate display advertisements. The questions of substance addressed in this opinion relate to the first claim.

Plaintiffs seek declaratory and injunctive relief, as well as compensatory and punitive damages. They allege that the Times' advertisements violate Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601 *et seq.* (the Fair Housing Act or "FHA"), the Civil Rights Acts of 1866 and 1870, 42 U.S.C. §§ 1981 and 1982 and the Thirteenth Amendment of the United States Constitution.

The Times now moves to dismiss the complaint under Rule 12(b)(6), F.R.Civ.P., for failure to state a claim upon which relief may be granted.

### I.

On this motion I assume the truth of the complaint's factual allegations, including those quoted *supra*. That assumption does not extend to conclusory allegations of law.

On or about September 1987, plaintiffs' counsel met with lawyers for the Times and advised them that, in their view, the

Times was printing and publishing discriminatory advertisements in violation of the FHA and regulations promulgated thereunder by the United States Department of Housing and Urban Development ("HUD"), as well as in violation of the earlier civil rights statutes. During that meeting plaintiffs' counsel asked the Times to sign an agreement similar to one that comparable plaintiffs in the Washington, D.C. metropolitan area had obtained from *The Washington Post.* A copy of that agreement appears as Exhibit 1 to the complaint at bar. The Times refused to enter into such an agreement. Complaint, ¶ 14.

On or about February 16, 1988, the Times published a notice addressed to all advertisers who placed advertisements in the newspaper. Complaint, ¶ 15. That notice, a copy of which appears as Exhibit 2 to the complaint, recites the receipt by the Times of complaints "that certain real estate advertising published in the Times does not comply with federal and state fair housing laws and regulations"; proclaims its belief "that our policies must reflect both the requirement and spirit of the fair housing laws"; and then says in part:

> Effective January 1, 1988, the Times will require that all real estate display ads include the "Equal Housing Opportunity" tag line recommended by the federal regulations. Ads which fail to include this statement will be rejected.

At the same time the Times published a pamphlet of its standards for acceptable advertising. Complaint, ¶ 16. A copy appears as Exhibit 3 to the complaint. In that pamphlet the Times stated that it would not accept, *inter alia:*

> Advertisements which fail to comply with the express requirements of federal and state laws against discrimination, including Title VIII and the Fair Housing Act, or which otherwise discriminate on grounds of race, religion, national origin, sex, age, marital status or disability.

The complaint goes on to allege that since February 1988 the Times has not asked advertisers to stop submitting real estate advertising campaigns with all-white human models. On the contrary, the Times has continued to print or publish advertisements that contain "virtually all white human models and that violate the size standards for Equal Housing Opportunity logotypes." The Times has also "continued to print and publish numerous advertisements that picture all-white models in advertisements for realty located in predominantly white buildings, developments, communities or neighborhoods. It has also printed and published a few advertisements that picture all black models in advertisements for realty located in predominantly black buildings, developments, communities or neighborhoods." Complaint, ¶ 19. That use of human models in advertising "personalizes the advertisements and encourages consumers to identify themselves in a positive way with the models and housing featured", in that "human models often represent actual or potential purchasers or renters, or the type of potential purchasers or renters that the real estate owner has targeted as desirable occupants." *Ibid.* "In consequence, the repeated and continued depiction of white human models and the virtual absence of any black human models" in these real estate advertisements "indicates a preference on the basis of race and color", *id.,* ¶ 20. The individual plaintiffs allege that they "have looked at human model real estate advertisements in *The New York Times* and have been injured and offended by those advertisements due to their clear indication of a preference, limitation, and discrimination based on race." *Id.,* ¶ 23. The institutional plaintiff alleges that the Times' preferential advertising has "interfered" with its objectives. *Id.,* ¶ 25.

## II.

Plaintiffs allege that by this conduct the Times has violated those provisions of the FHA found at 42 U.S.C. § 3604(a) and (c), as well as the Civil Rights Acts of 1866 and 1870, 42 U.S.C. §§ 1981 and 1982, and the Thirteenth Amendment.

Congress enacted the FHA in 1968. In § 3604, the Act makes it unlawful:

> (a) To refuse to sell or rent after the making of a bona fide offer, or to

refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

\* \* \* \* \* \*

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or any intention to make any such preference, limitation, or discrimination.

HUD, the agency charged with implementing the FHA, issued "Advertising Guidelines for Fair Housing" in 1972. In 1980 HUD promulgated regulations, 24 C.F.R. Part 109, which constitute "a reissuance in regulation form of the Advertising Guidelines for Fair Housing, with certain revisions." 45 Fed.Reg. at 57102. The HUD regulations state in pertinent part, at § 109.30(a) and (b):

(a) *Use of Equal Housing Opportunity logotype, statement, or slogan.* All advertising of residential real estate for sale, rent, or financing should contain an equal housing opportunity logotype, statement, or slogan as a means of educating the public that the property is available to all persons regardless of race [or] color. . . .

(b) *Use of human models.* Human models in photographs, drawings, or other graphic techniques may not be used to indicate exclusiveness because of race, color, religion, sex, handicap, familial status, or national origin. If models are used in display advertising campaigns, the models should be clearly definable as reasonably representing majority and minority groups in the metropolitan area, both sexes, and, when appropriate, families with children. Models, if used, should portray persons in an equal social setting and indicate to the general public that the housing is open to all without regard to race, color, religion, sex, handicap, familial status, or national origin,

and is not for the exclusive use of one such group.

Although plaintiffs plead a violation by the Times of § 3604(a) of the FHA, they make no effort in the briefs or oral argument to sustain it. Accordingly the Times' motion to dismiss that claim under Rule 12(b)(6) will be granted.

The question of substance relates to the viability of plaintiffs' claim that the Times' use of human models in the real estate advertisements it has published and continues to publish, as described in allegations I am bound on this motion to accept, violate § 3604(c) of the FHA and its accompanying HUD regulations.

The Times' main brief makes two basic arguments. First, the FHA and the regulations cannot be read to proscribe the advertisements at issue. Second, if the statute and regulations could be interpreted to bar a publisher from carrying such advertisements, the statutory and regulatory scheme would violate the First Amendment.

The Times' reply brief adds a third argument: the Act and regulations, if applied against a publisher of real estate advertisements to mandate its conduct, are impermissibly vague.

This Part of the opinion considers the first argument.

It is useful at the outset to recall the criteria for granting or denying a motion to dismiss under Rule 12(b)(6). It is not just that the complaint's factual allegations must be accepted as true. The motion to dismiss for failure to state a claim may succeed only if the face of the complaint, accepting the truth of its factual allegations, makes it appear "beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1947).

■ Applying these principles to the case at bar, the question is whether the Times has shown that plaintiffs can prove no set of facts in support of their claim that the Times' printing and publishing of

real estate advertisements, as alleged in the complaint, "indicates any preference, limitation, or discrimination based on race [or] color", as prohibited by Section 3604(c) of the FHA. To support their claim that these advertisements have conveyed that prohibited indication, the individual plaintiffs would undoubtedly give testimony of their own perceptions and reactions consistent with the allegations of their complaint. One may also reasonably anticipate corroborative testimony from expert witnesses who "have done considerable academic and market research on the effect of the racial composition of advertising models on the consumer." *Saunders v. General Services Corp.*, 659 F.Supp. 1042, 1058 (E.D.Va. 1986) (complaint under § 3604(c) claiming that real estate development's use of brochure with "virtual absence of black models from the sixty-eight photographs in that brochure containing human models" indicated discriminatory preference in violation of the Act).

In order to prove a violation of this subsection, plaintiffs need not establish that the Times intended to express a racial preference. *Saunders v. General Services Corp.*, *supra*, at 1058, citing *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978). *See also Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1037 (2d Cir.1979). The ultimate issue for the finder of facts will be whether "[t]o an ordinary reader the natural interpretation of the advertisements published [in the newspaper] is that they indicate a racial preference in the acceptance of tenants." *United States v. Hunter*, 459 F.2d 205, 215 (4th Cir.), *cert. denied*, 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972).

The Times does not argue that "advertisements" fall outside the reach of § 3604(c); nor could it do so, in the face of the statute's plain wording. "The Act makes it unlawful *inter alia* to publish any advertisement with respect to the sale or rental of housing that indicates any preference or limitation based on race or color. 42 U.S.C. § 3604(c). Clearly, then, the subject matter of the lawsuit is covered by the

statute." *Spann v. The Carley Capital Group*, No. 87–0054 (HHG), 1988 WL 166665 (D.D.C., December 13, 1988), at slip op. 5 (suit against owners of housing development).

Furthermore, the Times stops just short of contending that the statute does not apply to newspapers which print or publish advertisements alleged to be in violation of § 3604(c). Such a contention would be sufficiently answered by the Fourth Circuit's analysis in *United States v. Hunter*, *supra*, at 210:

> [§ 3604(c) ] provides on its face no exceptions in favor of newspapers. Rather, it uses precisely the language which would lead the ordinary reader to conclude that newspapers are to be brought within its purview. The section provides it shall be unlawful "to make, print, publish, or cause to be made, printed, or published" any advertisement prohibited by the Act. In the context of classified real estate advertising, landlords and brokers "cause" advertisements to be printed or published and generally newspapers "print" and "publish" them. Since each phrase in a statute must, if possible, be given effect, *United States v. Menasche*, 348 U.S. 528, 538–539, 75 S.Ct. 513 [519–520,] 99 L.Ed. 615 (1955), both landlords and newspapers are within the section's reach.

The Times' first argument is more narrow. The contention is aptly summarized in the heading to the first point of its main brief: "the use of models of one race in display advertisements does not by itself indicate an illegal preference, limitation or discrimination based on race or color."

Again, one must remember the procedural context in which this argument is made. To obtain dismissal of the complaint for failure to state a claim, the Times must show that the pattern of real estate advertisements it has printed and published cannot be characterized as violative of the FHA *as a matter of law;* or, to put the case somewhat differently, plaintiffs could adduce no proof entitling the finder of facts to conclude that these advertisements

indicated racial preference, limitation, or discrimination.

In support of its argument, the Times makes two contentions. First, it argues that the HUD regulations "are not mandatory and do not require a specific number of black models in advertisements." Main brief at 10. Second, the Times relies on caselaw which it says "does not support a finding of liability based solely on the ads." *Id.* at 14.

As to the regulations, the Times' argument is inaccurate in one significant aspect, and further flawed by the setting up of a straw man against whom the major thrust of its argument is directed.

The first sentence of the pertinent HUD regulation, 24 C.F.R. § 109.30(b), is mandatory. That sentence reads:

Human models in photographs, drawings, or other graphic techniques may not be used to indicate exclusiveness because of race, color, religion, sex, handicap, familial status, or national origin.

By that sentence, which cannot reasonably be dismissed as only suggestive or precatory, the agency identifies human models as a means by which advertisements may indicate discriminatory preference; and, having identified that means, forbids its use. "May not" is the grammatical equivalent of the scriptural commandment "shalt not." That declaration by the agency charged with enforcing the statute is entitled to judicial recognition. *See Ragin v. Steiner, Clateman and Associates, Inc.,* 714 F.Supp. 709, 713 n. 3 (S.D.N.Y.1989) ("use of all white human model display advertising is contrary to HUD regulations which are entitled to deference"). *Cf. Hunter, supra,* at 215 n. 11:

The Secretary of Housing and Urban Development has promulgated Advertising Guidelines for Fair Housing, 37 F.R. 6700 (April 1, 1972), which explicitly provide not only that newspapers are subject to the Act, but also that a phrase like "white home" is presumed discriminatory.

In *Saunders, supra,* at 1058, Judge Merhige cited that footnote in observing that the Fourth Circuit in *Hunter* also "cited

HUD advertising guidelines as support for its position."

The second and third sentences of § 109.30(b) contain the word "should". "If models are used in display advertising campaigns", the regulation goes on to describe criteria which "should" be observed. These sentences, the Times argues, reduces the entire regulatory scheme to the level of suggestion, at least in respect of the use of human models. And the Times points to HUD's explanation of its regulations, appearing at 45 Fed.Reg. 57102:

Civil rights organizations maintained that the language of the regulation should be mandatory throughout (substituting "must" for "should" in describing practices to be avoided or encouraged) and that the fair housing statement should be uniform and mandatory. Representatives of the media and financial institutions, on the other hand, objected to the issuance of the guidelines as a regulation, and to specific provisions of the regulation, as potential infringements on First Amendment rights.

The agency further said of the regulation as promulgated:

It was the intent of this regulatory effort to produce a rule which represents a balance between (1) identification of practices which might be viewed as violations of Title VIII and (2) the limitations which the First Amendment may impose on mandatory restrictions relating to the publication of advertising.

Neither group prevailed entirely. Civil rights organizations did not achieve mandatory language "throughout" the regulations. The media and financial institutions, preferring the former "guidelines", lost their effort to avoid any form of regulation. What emerged is a regulation mandatory in its general prohibition of the use of human models as an indicator of discriminatory preference, but suggestive in respect of particular "examples of advertising practices, content, etc., which might be indicative of violation of (or compliance with) Title VIII and which the Department will review and consider in investigating complaints alleging discriminatory housing

practices involving advertising." 45 Fed. Reg. at 57102.

The distinction is important for Rule 12(b)(6) analysis. All I need consider at present is whether the agency regulations support or foreclose plaintiffs' claim that the Times' advertising practices, as described in the complaint, violate the statutory and regulatory scheme. Clearly the mandatory language in the first sentence of § 109.30(b) supports that claim. I do not regard the balance of the regulation as foreclosing it.

The Times' straw man argument assumes that plaintiffs interpret the regulations as requiring "a specific number of black models in advertisements." Main brief at 10. I do not understand plaintiffs to make that particular argument. Indeed, they specifically disclaim it in their brief at 17 (n. 7), stressing instead their allegation "that the Times' practice of printing and publishing advertisements with virtually all human white models in a city with a significant population of blacks and other minorities violates the Act." This is the claim upon which Rule 12(b)(6) analysis must focus. To be sure, as an exercise to prepare for oral argument the Court instructed plaintiffs to draft the sort of injunction they would propose if successful on the merits; and the proposed injunction contains requirements for the inclusion of specified numbers of black models in advertising campaigns. But there is a difference between what regulations mandate or do not mandate, and the remedy a court of equity may fashion, assuming plaintiffs prevail at a trial on the merits. It is worth repeating that I am here concerned only with the legal sufficiency of plaintiff's claim.

Turning to caselaw, the Times relies upon *Saunders, supra,* and *Spann v. Colonial Village, Inc.,* 662 F.Supp. 541 (D.D.C. 1987). The "logic" of these two district court cases, it is said, "requires dismissal of the instant complaint." Main brief at 14.

Both parties at bar profess to find support in *Saunders.* Plaintiffs sued the owners of a real estate development for failure to include in their advertising an equal housing opportunity logo, and for the failure of their 38–page *Lifestyle* advertising brochure "to include an adequate number of black models, thereby impermissibly indicating a preference based on race." 659 F.Supp. at 1049. After trial, Judge Merhige found "that the natural interpretation of the *Lifestyle* brochure is to indicate that GSC apartment complexes are for white, and not black, tenants, thus discouraging blacks from seeking housing there", *id.* at 1058, leading to the Court's conclusion "that GSC's use of the *Lifestyle* brochure violated the [Fair Housing] Act", *id.* at 1059. Not much comfort for the Times in that.

But the Times finds comfort in what Judge Merhige said on the subject of the appropriate remedy. Plaintiffs in *Saunders,* as do plaintiffs at bar, sought both declaratory and injunctive relief (as well as money damages). Judge Merhige observed that the district courts "should not grant injunctive relief unless 'there exists some cognizable danger of recurrent violation.'" *Id.* at 1060 (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)). He then said:

> In the instant case, while declaratory relief is appropriate, the Court is not convinced that a cognizable danger exists that defendants will continue to violate their advertising obligations under the Act. In fact, although perhaps induced by the instant litigation, defendants have subsequently revised *Lifestyle* to increase the use of black models. Plaintiffs' own experts testified that the revised brochure did not indicate a racial preference. The Court finds that a declaratory judgment, combined with monetary damages, will adequately redress plaintiffs' injuries and provide assurances that defendants will not engage in future violations.
>
> In addition, the Court finds that plaintiffs are not entitled by law to force defendants to give proportional representation to blacks in their advertising, nor is there any evidence in the record that such representation would be necessarily

required to avoid indicating a racial preference.

*Ibid.*

It is this last paragraph which finds particular favor with the Times.

Viewed in context, the specific language relied upon by the Times deals with remedy, and not the legal viability of plaintiffs' claim. On that issue, *Saunders* supports plaintiffs at bar. That language also deals with requiring strict proportionality of black models in advertising, rather than reasonable representation (which the defendant in *Saunders* had implemented). The appropriate remedy in the instant case may be considered if plaintiffs succeed on the merits. But *Saunders* can hardly be said to support, much less "require", dismissal of the complaint under Rule 12(b)(6).

*Spann v. Colonial Village, Inc.* was an action by similarly situated plaintiffs against the owners of a housing development in the metropolitan Washington, D.C. area and its advertising agency. From January to April 1986, the apartment complex owner caused to be published advertisements in *The Washington Post* which featured exclusively white human models. Plaintiffs filed an administrative complaint with HUD in April 1986. Although the administrative complaint remained unresolved, the developer gave instructions to its advertising agency to change its policy. Judge Greene found that during the ten-month period from April 1986 to February 1987, "at least thirty-six percent of Colonial's ads published in the *Post* have featured black models", and that during the 180 days immediately proceeding filing of the complaint in court, "28.6 percent of all of Colonial's ads in *The Post* featured a black model." The district court made comparable findings with respect to the defendant advertising agency. From January 1985 through May 1986, for various housing complexes, the agency placed advertisements depicting only white models. Administrative complaints were also filed against the agency. Judge Greene found that during the 180–day period immediately proceeding the institution of suit, "thirty percent of the published, display ads made

by Gerstin [the agency] featured black models, and forty percent of the Gerstin display ads published in *The Post* during that period featured one or more black models." 662 F.Supp. at 543.

Unappeased by these manifest changes in advertising policy, plaintiffs in *Spann v. Colonial Village* pressed their suit. Their theory appears to have been that the suggestive language in § 109.30(b) of the regulations, as well as the underlying statute, should "be construed to require proportional representation of the models of each race in all advertising", *id.* at 544.

Judge Greene rejected that theory; but the present defendant's reliance on *Colonial Village* is misplaced. As Judge Greene explained, *Colonial Village* was a case "in which the number of black models used hovered between approximately thirty and forty percent; and . . . all of which included an equal housing opportunity slogan and logo." *Id.* at 544. Given that the population of Washington D.C. was approximately 27% black, no reasonable person could infer racial preference from such advertisements. The Court rejected plaintiffs' claim because it would essentially have required a flat rule of proportionality in every display advertisement:

> the Court would not be justified in construing section 3604 as establishing a flat rule requiring the use in ads of models of a particular race or sex in particular proportions.

*Id.* at 546.

The Court's ruling in *Colonial Village* is that, in circumstances where there is no genuine discrepancy between the percentage of black models used in an advertising campaign or practice and the percentage of blacks in the relevant community, the exact racial proportionality of particular advertisements alone will not support a claim under § 3604(c). Or, as Judge Greene explained and clarified in *Spann v. The Carley Capital Group, Colonial Village* stands for the proposition "that if in real estate advertisements some photographs feature white models, some black models, and some of both, no violation of the Act occurs merely because the races are not

represented proportionately to population, or because black models are not included in every display, unless an intention to discriminate is shown by extrinsic evidence." *The Carley Capital Group*, No. 87–0054(HHG), slip op. at 7.

In the case at bar, plaintiffs do not limit their claim to a lack of strict proportionality in the representation of races, as did the plaintiffs in *Colonial Village*. Instead, plaintiffs allege display ads featuring thousands of human models "of whom virtually none were black"; ads where potential renters were white and the service staff was black; ads displaying "virtually all white human models"; ads with all white models for buildings in predominantly white communities; and ads with all black models in predominantly black communities.

I do not construe the FHA and the regulations to prohibit *only* the total exclusion of black models. The statute is remedial. So narrow a construction is inappropriate. Between the polar extremes of total exclusion, and strict proportionalism according to population percentages, the proof at trial may show sufficient numbers of black models to achieve fair representation; or such a paucity of black models as to constitute "tokenism." The factfinder could, in my judgment, lawfully conclude that proof of the former does not violate the FHA; but that proof of the latter does offend a statute prohibiting advertisements which indicate a racial preference. What the proof will actually show—polar extremes in respect of particular advertising campaigns, or midpoints along the spectrum—is for discovery and trial.

The cases support these concepts of violative conduct. Judge Greene explicitly recognized in *Carley Capital Group* that the total exclusion of black models would take the case out of his ruling in *Colonial Village*. Thus he added in *Carley:*

> Plaintiffs claim—at this stage of the proceedings without contradiction—that during the periods of time covered by the complaints, advertisements were published by defendants that failed to include a single black model, and that in other

respects as well intentional racial discrimination occurred. On this basis, there is no warrant for dismissing the complaints, in whole or in part.

Slip op. at 7. Judge Sand of this Court reached the same conclusion in *Ragin v. Steiner, Clateman and Associates, Inc., supra,* when he denied defendants' motion for summary judgment on plaintiffs' § 3604(c) claim. The defendants relied on Judge Greene's opinion in *Colonial Village;* but Judge Sand rejected the argument for reasons fully applicable here:

> *Spann,* however, is entirely distinguishable from a case in which only all white models appear in advertising. In *Spann,* during the relevant period, defendants ran ads with both white and black models. Judge Greene held that § 3604(c) did not require a flat rule of mathematical proportionality and that the Fair Housing Act was not violated merely because models of a particular race were not used in one ad or series of ads. *Id.* at 546. Judge Greene has himself distinguished this circumstance from one in which only white models have been consistently used. *Spann v. The Carley Capital Group,* N. 87–0054, slip op. at 7 (D.D.C., Dec. 13, 1988). We see no basis for dismissing the § 3064(c) claim.

714 F.Supp. at 713 (footnote omitted).

The "tokenism" concept of conduct violating § 3604(c) may be detected in *Saunders v. General Services Corp., supra.* In *Saunders,* Judge Merhige concluded, after a bench trial, that the "virtual absence" of black models from a promotional brochure indicated racial preference and thus violated § 3604(c). 659 F.Supp. at 1058. In that case, the Court was confronted with a 38–page brochure that included sixty-eight photographs containing human models. Virtually none of the models were black. The Court's task as fact-finder was to "determine from the conflicting evidence whether the *Lifestyle* brochure's *paucity of black models* indicates a racial preference to the ordinary reader." *Id.* at 1058 (emphasis added). The Court concluded:

> Thus, the Court finds that the natural interpretation of the *Lifestyle* brochure

is to indicate that [defendant's] apartment complexes are for white, and not black, tenants, thus discouraging blacks from seeking housing there.

*Id.* at 1058.

Because plaintiffs state a claim which their proof at trial may sustain, defendant's Rule 12(b)(6) motion fails.

## III.

■ Alternatively, the Times argues that if the statutory and regulatory language is interpreted to bar a newspaper from publishing the sort of advertisements alleged in the complaint, the FHA would violate the First Amendment. That is so, the Times argues, because the First Amendment does not permit government to require a publisher to monitor and enforce the laws or to regulate the content of published material, particularly where advertisements "are not discriminatory on their face and only very indirectly affect housing transactions." Main brief at 20, 29.

The flaw in the Times' constitutional argument lies in the nature of the plaintiffs' claim. Plaintiffs claim that the Times published and publishes advertisements which indicate discriminatory preference in housing. These kind of advertisements further an illegal commercial activity: racial discrimination in the sale or rental of real estate. I have concluded under Point II that plaintiffs' claim may not be dismissed under Rule 12(b)(6). If the fact finder accepts plaintiffs' claim after trial, the Times will be found to have published advertisements that further illegal activity. That would dispose of the Times' constitutional defense, since commercial speech concerning unlawful activity is not protected by the First Amendment. *Posadas de Puerto Rico v. Tourism Company,* 478 U.S. 328, 340, 106 S.Ct. 2968, 2976, 92 L.Ed.2d 266

(1986); *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980) ("The government may ban ... commercial speech related to illegal activity ..."); *Pittsburgh Press Co. v. Human Relations Commission,* 413 U.S. 376, 388, 93 S.Ct. 2553, 2560, 37 L.Ed.2d 669 (1973). *See also Village of Hoffman Estates v. The Flipside,* 455 U.S. 489, 496, 102 S.Ct. 1186, 1192, 71 L.Ed.2d 362 (1982) ("The ordinance is expressly directed at commercial activity promoting or encouraging illegal drug use. If that activity is deemed 'speech,' then it is speech proposing an illegal transaction, which a government may regulate or ban entirely").[1]

While these and other Supreme Court cases stand for the same general proposition, *Pittsburgh Press Co.* is closest on the facts. The defendant published a newspaper in Pittsburgh which maintained a sex-designated classification system for help-wanted advertisements. There was a "Jobs—Male Interest" column and a "Jobs—Female Interest" column. A local ordinance forbade employers, employment agencies or labor organizations from publishing or causing to be published any advertisement indicating discrimination because of sex; and forbade all other entities from aiding such unlawful acts. Faced with prosecution under that ordinance, the newspaper publisher sought refuge in the First Amendment. The Court rejected the argument:

Discrimination in employment is not only commercial activity, it is *illegal* commercial activity under the Ordinance. We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or

**1.** Defendant New York Times is entitled to no greater First Amendment protection than a real estate owner, an advertiser or any other person. "[D]espite its separate protection by the first amendment, the prevailing view is that the press enjoys no special status under the Constitution." Tribe, *American Constitutional Law,* 963 (2nd ed.1988); *see also* Anderson, "The Origins of the Press Clause," 30 U.C.L.A.L.Rev. 455, 456 and n. 8 (1983) ("[t]hus far the Supreme Court ... has refused to give the press any more protection than an individual enjoys under the speech clause") (cases cited therein). Thus, while the press is protected from invidious discrimination because of the Freedom of Press Clause, *see* Tribe at 963 n. 63, the press is treated like any other person for purposes of free speech analysis and for purposes of the commercial speech doctrine.

soliciting prostitutes. Nor would the result be different if the nature of the transaction were indicated by placement under columns captioned "Narcotics for Sale" and "Prostitutes Wanted" rather than stated within the four corners of the advertisement.

The illegality in this case may be less overt, but we see no difference in principle here.

413 U.S. at 388, 93 S.Ct. at 2560 (emphasis in original) (footnote omitted).

The Times seeks to distinguish *Pittsburgh Press* because the publisher contributed the discriminatory employment column headings, which the Times characterizes as "a far cry from the signals allegedly emitted by the race of models in real estate ads. carried by a passive publisher." Main brief at 22 n. 8. The Times also stresses that in *Hunter, supra,* the apartment offered for rent was described by the advertisement as being in a "white home." Those differences are not controlling. Illegality may be more or less overt. Publishers may be relatively "active" or "passive." But caselaw holds and common sense confirms that consistent use of exclusively or near-exclusively white models may operate as the functional equivalent of more explicit verbal racial messages. If the Times' argument is that "passive" publishers should not be subject to the Act, that argument must be addressed to Congress, not the courts.

The Times relies upon *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), for the proposition that the Act impermissibly casts upon the press the governmental obligation of monitoring discriminatory advertising. In *Bigelow,* the Supreme Court reversed the criminal conviction of an underground newspaper for publishing an advertisement encouraging abortion. But *Bigelow* is inapposite because abortion is constitutionally protected whereas housing discrimination is illegal. The Court stressed that distinction in *Posadas de Puerto Rico Associates, supra.* In *Posadas* a local statute legalized casino gambling in licensed places to promote tourism, but also provided that no gam-

bling room could advertise their facilities to the public of Puerto Rico. The plaintiffs, hotel and casino owners, challenged the facial constitutionality of the statute and accompanying regulations on First Amendment grounds, relying on *Bigelow* and *Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (striking down a ban on any advertisement or display of contraceptives). Rejecting the argument, the Court said in *Posadas:*

> We think appellant's argument ignores a crucial distinction between the *Carey* and *Bigelow* decisions and the instant case. In *Carey* and *Bigelow,* the underlying conduct that was the subject of the advertising restrictions was constitutionally protected and could not have been prohibited by the State. Here, on the other hand, the Puerto Rico Legislature surely could have prohibited casino gambling by the residents of Puerto Rico altogether. In our view, the greater power to completely ban casino gambling necessarily includes the lesser power to ban advertising of casino gambling, and *Carey* and *Bigelow* are hence inapposite.

478 U.S. at 345–46, 106 S.Ct. at 2979.

So in the case at bar, the undoubted power of Congress to ban discrimination in housing necessarily includes the lesser power to ban advertising which indicates a discriminatory preference.

Relying on *News & Sun–Sentinel Company v. Board of County Commissioners,* 693 F.Supp. 1066 (S.D.Fla.1987), the Times contends that monitoring real estate advertisements for indications of racial preference would place an undue burden upon publishers. Plaintiff publisher in *News & Sun–Sentinel Company* attacked a local ordinance making it a misdemeanor to publish an advertisement for contracting services unless the ad included the contractor's "certificate of competency" number. The ads in question were classified service advertisements, phoned in to the newspaper publisher at the rate of four hundred each day. The district judge was impressed by the many additional steps and effort that would be required by the pub-

lisher to ensure proper compliance with the ordinance. 693 F.Supp. at 1068. It is not clear that monitoring real estate advertisements for indications of discriminatory preference would be so onerous. *The Washington Post*, a newspaper of some consequence in a metropolis of some size, had no difficulty in agreeing with comparable plaintiffs to require specified black representation in different kinds of advertisements; recordkeeping of real estate display sections for three years; and enforcement by means of notices to advertisers, monitoring compliance, and prohibition of advertisements if the advertiser did not comply, all the while keeping copies of such notices for plaintiffs' inspection. I have a parochial reluctance to conclude that what the *Washington Post* can do to eliminate all the ads unfit to print, the *New York Times* cannot do.

Again, within the Rule 12(b)(6) context it is not necessary to address in detail the relief to which plaintiffs at bar might be entitled if they prevail at trial. It is sufficient for present purposes to say that the First Amendment does not bar the claim as a matter of law.

### IV.

■ The Times' final argument with respect to the FHA, raised in its reply brief, is that the statute and regulations, if applied against a publisher of real estate ads to require a certain number of black models, are impermissibly vague. The Times relies upon *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972) and its progeny, including *Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) and *Hynes v. Mayor of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976).

All three cases involved criminal statutes infringing on political speech. *Grayned* concerned anti-picketing and anti-noise ordinances under which students protesting race issues were arrested and convicted. In *Smith* the Court struck for vagueness a Massachusetts flag-misuse statute that imposed criminal sanctions for treating the flag "contemptuously", under which a man

was incarcerated for wearing a small cloth version of the flag sewn to the seat of his trousers. In *Hynes* the Court struck for vagueness an ordinance requiring that advance notice be given by any person seeking to solicit door-to-door for political campaigns or causes, on pain of imprisonment and fines.

The relevance of the "void-for vagueness" doctrine to the case at bar is problematical. The doctrine is most clearly identified with criminal law, deriving its origins from procedural due process: the citizen's fundamental right to know in advance and with precision the type of behavior that may result in criminal penalties. The doctrine is also closely associated with the First Amendment Right to engage in protected political speech and conduct. The case at bar, however, does not involve a criminal prosecution of political speech. Rather, it involves a civil suit between private parties involving commercial speech. The Times does not cite, and this Court's research has not disclosed, a case applying or undertaking to define the concept of vagueness in the context of a civil suit involving commercial speech.

Assuming without deciding that the doctrine is applicable, the FHA passes muster. A violation of § 3604(c) occurs if the natural interpretation of the advertisements "to the ordinary reader" is that they indicate a racial preference in the acceptance of housing purchasers or tenants. *U.S. v. Hunter*, *supra*, at 215. The "ordinary reader" is nothing more, but nothing less, than the common law's "reasonable man": that familiar creature by whose standards human conduct has been judged for centuries. For comparable reasons, Justice Holmes upheld the Sherman Act's "rule of reason" standard against a challenge for vagueness:

> [T]he law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death.

*Nash v. United States,* 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232 (1913).

I agree with the Fourth Circuit's observations in *Hunter* at 213 that:

> a newspaper publisher can easily distinguish between permissible and impermissible advertisements in discharging his duty to reject those that violate § 3604(c).... However the language of the advertisement is couched, the purpose of an advertiser who wishes to publish an advertisement in violation of the Act is to communicate his intent to discriminate and a newspaper publisher can divine this intent as well as any of his readers.

That is true of language. It is equally true of a picture, that formidable alternative form of speech which the Chinese regard as the potential equivalent of 10,000 words.

There is no constitutional due process bar to plaintiffs' claim.

### V.

■ The Times is entitled to an order dismissing plaintiff's claims under 42 U.S.C. §§ 1981 and 1982, and the Thirteenth Amendment.

Section 1981 reads:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Section 1982 reads:

> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

These provisions were enacted pursuant to the grant of authority to Congress contained in the Thirteenth Amendment. They are companion statutes in that they both derive from the same legislative history, Section 1 of the Civil Rights Act of 1866, and are to be construed and treated together. *Runyon v. McCrary,* 427 U.S. 160, 170, 96 S.Ct. 2586, 2594, 49 L.Ed.2d 415 (1976); *see also Patterson v. McLean Credit Union,* —— U.S. ——, 109 S.Ct. 2363, 2372, 105 L.Ed.2d 132 (1989) (construing § 1981 in light of § 1982, the "companion statute").

The Times maintains that discrimination in the advertising of real estate is not actionable under either §§ 1981 or 1982. The weight of authority supports defendant's position. Accordingly, these claims will be dismissed.

In *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), which held that § 1982 reaches private conduct, the Court defined the statute's scope. In particular, the Court indicated that § 1982 does not reach discrimination in advertising. The Court wrote:

> Whatever else it may be, 42 U.S.C. § 1982 is not a comprehensive open housing law. In sharp contrast to the Fair Housing Title (Title VIII) of the Civil Rights Act of 1968, Pub.L. 90–284, 82 Stat. 81, the statute in this case deals only with racial discrimination and does not address itself to discrimination on grounds of religion or national origin. It does not deal specifically with discrimination in the provision of services or facilities in connection with the sale or rental of a dwelling. *It does not prohibit advertising or other representations that indicate discriminatory preferences.*

392 U.S. at 413, 88 S.Ct. at 2189 (emphasis added) (footnote omitted). After each sentence, the Court dropped a footnote contrasting § 1982 with the Fair Housing Act. After the last sentence just quoted, the Court noted: "Contrast §§ [3604](c), (d), (e)." *Id.* at 413 n. 8, 88 S.Ct. at 2189 n. 8.

The Court's statement in *Jones* may arguably be regarded as *dictum;* however, given the source, it is persuasive. As has every other court considering the issue, I dismiss plaintiffs' claims under §§ 1981 and 1982. *Saunders v. General Services Corp.,* 659 F.Supp. at 1063; *Spann v. Colo-*

*nial Village, Inc.,* 662 F.Supp. at 547; *Ragin v. Steiner, Clateman and Associates,* 714 F.Supp. at 713–714.

Despite plaintiffs' contentions, the Supreme Court's recent decision in *Patterson v. McLean Credit Union, supra,* does not support their claim under §§ 1981 and 1982. Plaintiffs contend that *Patterson* reinterpreted the scope of § 1981 to apply only to the formation stage of a contract. Relying on a passage of the opinion that states "[§ 1981] prohibits, when based on race, the refusal to enter into a contract with someone, *as well as the offer to make a contract only on discriminatory terms,*" *id.* 109 S.Ct. at 2372, plaintiffs argue that advertisements pertain to the formation stage of the contract and are thus covered by § 1981.

Plaintiffs' argument is without merit. In *Patterson v. McLean Credit Union,* the Court held that a claim for racial harassment after the contractual relationship of employment has been established is not actionable under § 1981. The Court emphasized that § 1981 only covers conduct at the initial formation of the contract, and conduct that impairs the right to enforce contract obligations through the legal process. *Id.* 109 S.Ct. at 2374. Clearly, the holding in *Patterson* does not help the plaintiffs. Nor does the rationale of *Patterson* favor plaintiffs. Relying on *Jones v. Alfred H. Mayer Co.,* the Court in *Patterson* declared:

> The most obvious feature of [§ 1981] is the restriction of its scope to forbidding discrimination in the "mak[ing] and enforce[ment]" of contracts alone. Where an alleged act of discrimination does not involve the impairment of one of these specific rights, § 1981 provides no relief. Section 1981 cannot be construed as a general proscription of racial discrimination in all aspects of contract relations, for it expressly prohibits discrimination only in the making and enforcement of contracts.

*Patterson,* 109 S.Ct. at 2372. This statement clearly runs counter to plaintiffs' contentions.

If anything, as Judge Sand points out in *Ragin v. Steiner, Clateman and Associates, supra,* the decision in *Patterson* is relevant here because of "the Supreme Court's approach to interpretation of § 1981 in which it expressed a reluctance 'to read an earlier statute broadly where the result is to circumvent the detailed remedial scheme constructed in a later statute.'" 714 F.Supp. at 713 (*quoting Patterson,* 109 S.Ct. at 2375).

## VI.

For the foregoing reasons, defendant's motion to dismiss the complaint insofar as it asserts claims under 42 U.S.C. §§ 3604(a), 1981, and 1982 is granted. The motion to dismiss plaintiffs' claim under 42 U.S.C. § 3604(c) is denied.

I will, if asked by either party, give consideration to certifying this opinion and order for interlocutory appeal under 28 U.S.C. § 1292(b). In saying that, I intimate no view on whether the certification would issue if requested. The question would have to be addressed in further briefs.

The parties are directed to attend a further status conference in Room 307 on January 12, 1990 at 3:30 p.m.

It is SO ORDERED.